IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-25-00037-JD |
| | ) | |
| JAMES JERMAINE HENNESY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant James Jermaine Hennesy's Motion to Suppress
Evidence and Request for *Jackson v. Denno* Hearing ("Mot. Suppress") [Doc. No. 72].
The United States filed a response ("Resp. Mot. Suppress") [Doc. No. 76].[1] The Court
held a hearing on September 2, 2025, at which time the parties were given an opportunity
to present evidence and for oral argument.

For the reasons stated below, the Court DENIES Hennesy's Motion to Suppress.

## I.     PROCEDURAL HISTORY AND BACKGROUND

On July 1, 2025, the United States filed a superseding indictment charging Mr.
Hennesy with one count of felon in possession of firearms in violation of 18 U.S.C.
§ 922(g)(1) on or about October 23, 2024, and one count of possession of cocaine with
intent to distribute in violation of 21 U.S.C. § 841(a)(1) on or about January 13, 2025.

---

[1] The Court uses CM/ECF page numbering from the stamp on top of the filings on
the district court docket.

Superseding Indictment at 2–3 [Doc. No. 55]. On July 17, 2025, Hennesy pleaded not guilty to both charges. Min. Entry at 1 [Doc. No. 69].

On August 8, 2025, Hennesy moved to suppress "all evidence seized by law enforcement and all custodial statements made during his prolonged detention by Agent Bryce White (White) of the D21 Task force on January 13, 2025." Mot. Suppress at 1. As confirmed by counsel at the hearing, the Motion to Suppress addresses only the charge of possession of cocaine with intent to distribute.

## II.    **FINDINGS OF FACT**

On Monday, January 13, 2025, at approximately 7:30 a.m., Agent Bryce White initiated a traffic stop of a white Lexus sedan traveling northbound on interstate 35 near mile marker 66. His patrol vehicle's dash camera and body-worn camera captured the ensuing events. *See* Ex. 1 [Doc. No. 76-1]; Ex. 2 [Doc. No. 76-2].[2] Agent White approaches the passenger side of the Lexus and advises the driver, later identified as James Hennesy, that he had been traveling 80 mph in a 75-mph zone. White tells Hennesy that he will receive a written warning. Ex. 1 at 1:23–1:33; Ex. 2 at 2:54–3:06. White notes in his report, and testified at the hearing, that upon his contact with Hennesy to explain the reason for the traffic stop, he noticed an odor of marijuana emitting from the vehicle. *See* White's Investigative Report, Ex. 3 at 3.

---

[2] Because most of the Court's citations to exhibits refer to the bodycam and dashcam footage submitted with the government's response, these exhibits are cited simply as "Ex. 1" and "Ex. 2." Exhibit 3 is White's Investigative Report, offered by the United States and admitted at the hearing. Citations to the exhibits submitted with Hennesy's Motion to Suppress are cited as "Def.'s Ex."

White asks Hennesy for his driver's license. Hennesy initially hands over his entire wallet before removing the license. White invites Hennesy to sit in the front passenger seat of his patrol car while he completes the written warning as doing so will be "faster." Hennesy agrees. As White returns to the cruiser, White muses to himself that Hennesy is nervous and that his hands are shaking. Ex. 1 at 1:38–2:02. White maintains a professional, conversational tone,[3] and the dashcam and bodycam footage do not show White locking the passenger side door in which Hennesy is seated. Ex. 1 at 2:08–2:23.

While in the patrol car, Hennesy tells White the Lexus belongs to a friend, and that Hennesy is using the car because his own vehicle's alignment was damaged. Hennesy identifies the passenger as his girlfriend, Racheal Joseph. Ex. 1 at 2:38–3:00; Ex. 2 at 3:12–3:34. When asked where they were coming from, Hennesy states "Houston" and says they had visited "over the weekend." Hennesy states he and Joseph had traveled to Houston on "Friday," and mentions going to Indian restaurants and visiting college friends of Joseph. Ex. 1 at 3:03–3:23; Ex. 2 at 3:36–3:46. At this interval, White is seen entering Hennesy's information into White's computer. Ex. 1 at 3:00–3:10.

White testified at the suppression hearing that his checks during a traffic stop and warning are to use his computer to verify the address provided by the individual against the license and computer, check the OLETS system for the presence of any NCIC warrants to determine if the individual is wanted, confirm the descriptions of the individual match the license and person for identification, and check the vehicle

---

[3] White maintains a professional, conversational tone throughout the available footage. *See generally*, Exs. 1–2.

registration to confirm the tag displayed and who owns the vehicle. White further

testified that there is an "actual handwritten warning," which will include the individual's

name, address, phone number, description of the traffic violation, time, location, and

vehicle. The typical time it takes to issue a warning in a traffic stop depends on various

factors, including, for example, if there is a different registered owner of the vehicle and

if there is permission to have the vehicle. Checking the vehicle's VIN through OLETS is

done to confirm the vehicle is not stolen when the driver does not provide ownership of

the vehicle.

    White then leaves his cruiser to verify the vehicle's VIN and contact Joseph, while

Hennesy sits alone in the passenger seat of the unlocked cruiser. Joseph tells White that

she and Hennesy went to Houston yesterday morning to visit friends. Lacking

identification, Joseph provides her name and date of birth to White. Ex. 1 at 4:12–5:30.

While White is absent from the cruiser, Hennesy uses his cell phone to make a call and

send a text message through voice-to-text. Ex. 2 at 4:53–5:47, 6:00–6:08.

    White muses to himself "this car's loaded" as he returns to the patrol car, Ex. 1 at

6:05–6:07, where he again asks Hennesy about the timing of the trip, Ex. 1 at 6:32–6:37.

Hennesy affirms his statement that the pair had gone to Houston on Friday. Ex. 1 at 6:27–

6:37. At this time, White is seen entering Joseph's information into his computer. Ex. 1 at

6:26–7:19.

    White then asks Hennesy whether he smokes marijuana, to which Hennesy

responds that Joseph smokes marijuana and that the odor came from her use. Ex. 1 at

8:01–8:08. White references a blunt visible in the Lexus, to which Hennesy states the

4

blunt is all that remains and volunteers that White can search the Lexus. Ex. 1 at 8:09–8:37. During this interval, White is seen on bodycam writing the warning, until he places the warning booklet on the dashboard in front of him at timestamp 8:46. Ex. 1 at 7:45–8:46.

Still in the patrol vehicle, White asks Hennesy about the possible presence of other contraband, including weapons, narcotics, cash, or cocaine. Ex. 1 at 9:06–9:25; Ex. 2 at 9:32–9:58. Hennesy denies having such items. *Id.* White then tells Hennesy that he is part of the "drug task force" and suggests he knows the pair left for Houston the previous calendar day, staying there for only two and a half hours before returning to Oklahoma. Ex. 1 at 9:31–9:48.[4]

Having presented this discrepancy and disclosed his role in the drug task force, White asks Hennesy, "[s]o, what's really in the car?" Ex. 1 at 9:50–9:55. Hennesy is silent in response to this question, so White follows up, "I'm very good at searching cars, James—it's what I do for a living." Ex. 1 at 9:55–10:03. Hennesy replies, "yes, I know." Ex. 1 at 10:03–10:04.

White then turns the conversation toward cooperation, stating Hennesy may be able to avoid consequences if Hennesy "want[s] to be honest." Ex. 1 at 10:07–10:13. White asserts he has "friends" he can call to help Hennesy and again asks Hennesy directly, "[w]hat's in there?", referring to the Lexus. Ex. 1 at 10:13–10:21; Ex. 2 at

---

[4] Agent Stevenson is seen entering the backseat of the cruiser as White points out this discrepancy. Ex. 2 at 10:19–10:29.

10:40–10:55. Hennesy takes a deep breath and pauses for a moment before responding, "you know." Ex. 1 at 10:21–10:29; Ex. 2 at 10:55–11:02. White immediately replies, "coke?", to which Hennesy again says, "you know." Ex. 1 at 10:29–30; Ex. 2 at 11:02–11:04. Almost immediately afterward, Hennesy reverts to denying contraband, stating, "there's nothing in there, bro. I told you, you could search the car," and adding that he would not have permitted the search had something been hidden in the car. Ex. 1 at 10:42–10:45; Ex. 2 at 11:14–11:18.

White emphasizes that he is trying to help Hennesy and describes himself as honest and straightforward. White explains that cooperation will require complete honesty, access to Hennesy's phone, and an account of "how the whole system works," noting White would need to call his boss, and that he can't make a promise roadside. Ex. 2 at 11:24–12:55. White tells Hennesy this proposed cooperation is "the only chance of you not going to jail." Ex. 1 at 12:07–12:12; Ex. 2 at 12:40–12:43. Hennesy is silent for a moment, during which time his phone rings again, and White states "[h]old on a sec, hang up for me," to which Hennesy tells the caller he will "call them back" before hanging up the call. Ex. 1 at 12:27–12:33.

Agent Stevenson then speaks to Hennesy in a similar conversational tone stating "you've already told us enough that we know what you did. We really would rather get the grow shut down than to take you to jail. That's what he's trying to tell you. I'm just trying to make it more clear to you. I'm just a little more direct." Ex. 1 at 12:57–13:15; Ex. 2 at 13:30–13:48. Stevenson continues, "we can go back, we can send a detective down here to talk to you, and you can give him all that stuff. And it's possible you can go

home today. It's possible you won't depending on your level of cooperation, but that's kinda what it is." Ex. 1 at 13:17–13:31; Ex. 2 at 13:49–14:04. Stevenson then asks Hennesy whether he wants to "go to jail for somebody else's stuff," to which Hennesy replies, "No, man. No." Ex. 1 at 13:31–13:36; Ex. 2 at 14:04–14:19.

Between 14:19 and 16:00 on the rear-facing dashcam footage, Hennesy grows increasingly emotional. *See* Ex. 2 at 14:19–16:00. Hennesy states, "I already broke the law. You know that. I broke the law." Ex. 2 at 14:35–14:43. He insists repeatedly that "nothing y'all could do [to] save me, bro," and says he is "fucked." Ex. 1 at 14:17–14:47.

As Hennesy's phone rings again, White tells Hennesy the ringing is "really distracting" and directs him to hand over the phone, which Hennesy does. Ex. 1 at 16:00–16:09. Moments later, Hennesy becomes more emotional and declares, "I am fucked. I am completely fucked." White asks why, and Hennesy responds, "Because it's cocaine." White presses, "You got coke in there?" and Hennesy answers, "cocaine." White asks how much, and Hennesy replies, "a lot of cocaine." When White presses further, Hennesy says, "Too much cocaine. Life sentence cocaine." Ex. 1 at 16:22–16:36; Ex. 2 at 17:00–17:10.

Immediately after this exchange, White tells Hennesy, "You're not under arrest, okay? But hear me out, James," and proceeds to read *Miranda* warnings from a card. White asks Hennesy if he understands his rights. Hennesy pauses briefly before answering, "yes." Ex. 2 at 17:35–18:06.

After acknowledging his rights, Hennesy becomes emotional again and states, "I'm going to jail, bro," to which White immediately replies, "No, sir." Ex. 1 at 17:47–

7

17:51. Hennesy states that he has crossed state lines with drugs and that it is "not a small amount." Ex. 1 at 17:51–18:00. Hennesy continues speaking about his role and characterizes himself as "just a courier." Ex. 2 at 19:46–19:51.

Hennesy provides limited information about the individuals involved, saying he does not know their names and is often told not to look in the packages. Ex. 2 at 20:54–22:00. He expresses doubt that cooperation will improve his position, and generally talks in circles, expressing emotion about the hopelessness of his situation. Ex. 1 at 22:30–23:30.

The remainder of the discussion continues to focus on Hennesy's potential cooperation and the details of his role in the operation. The agents explain their protocol, emphasizing they need information related to a higher ranked person in the operation in order to proceed with Hennesy. Ex. 2 at 30:25–30:33. They discuss developing a plan, obtaining specifics about location and timing, and potentially involving additional agencies if Hennesy is willing to cooperate. Ex. 2 at 43:28–44:24. The remainder of the dashcam footage revisits the same themes—delivery logistics, vehicles, contacts, payment, and worries of retaliation—with Hennesy providing partial details and hesitating to commit to full cooperation on camera. *See generally* Ex. 2. Officers eventually take Joseph from the Lexus and place her in the backseat of the patrol car behind Hennesy. Ex. 2 at 2:00:40. As the footage closes, Hennesy is seated in the front passenger seat of White's patrol car.

## III.    <u>RELEVANT LAW AND ANALYSIS</u>

The facts of this case weave a web implicating at least three distinct constitutional questions. These questions are (1) whether Agent White had reasonable suspicion to initiate a stop of Mr. Hennesy's vehicle; (2) whether Agent White had reasonable suspicion to prolong the stop; and (3) whether and when Mr. Hennesy was subject to custodial interrogation under the de facto arrest doctrine.[5]

### A.    **Agent White had reasonable suspicion to initiate the traffic stop.**

The Fourth Amendment of the United States Constitution protects individuals against "searches and seizures" that are unreasonable for lack of probable cause. U.S. Const. amend. IV. While traffic stops are seizures under the Fourth Amendment, such stops "need only have 'reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law.'" *Gabaldon v. New Mexico State Police*, 139 F.4th 1207, 1212 (10th Cir. 2025) (quoting *United States v. Gomez-Arzate*, 981 F.3d 832, 838 (10th Cir. 2020) and citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). And an "[o]bserved traffic violation[] necessarily 'afford[s] the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained.'" *Id.* (quoting *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009)).

---

[5] While Mr. Hennesy's motion putatively invokes *Jackson v. Denno*'s question of voluntariness, the parties' briefing and oral arguments make clear that this doctrine is not meaningfully invoked. *See infra*, note 11.

Hennesy asserts "the specific reasonable inferences drawn by White d[id] not support the stop." Mot. Suppress at 3. Hennesy argues that White's "observations of the posture of Mr. Hennesy [we]re not a reasonable factor" and that "only after utilizing the Federal License Plate Reader did [White] have an unparticularized suspicion or 'hunch' that '[Hennesy's] type of travel pattern [was] consistent with subjects involved in smuggling illegal narcotics . . . .'" *Id.* at 3–4 (quoting Def.'s Ex. 1 at 1 [Doc. No. 72-1]).

The government argues Agent White had reasonable suspicion to initiate the stop because he "observed [Hennesy] exceeding the posted speed limit." Resp. Mot. Suppress at 20. The government calls the notion that White stopped Hennesy "because of [Hennesy]'s posture and travel pattern" a "strawman." *Id.*

Agent White's bodycam footage does show him pacing Mr. Hennesy's vehicle at 80 mph in a 75-mph zone, and White can be heard reporting this rationale for initiating the traffic stop. Ex. 1 at 00:00–00:27. White also testified at the hearing that his patrol vehicle is "close enough" to "say for a fact that he's going that speed" and "speeding at 80." White's decision to follow Hennesy before initiating the stop did not require reasonable suspicion, as following a vehicle plainly does not impair its freedom of movement.[6] Agent White's observations of Hennesy's travel pattern and driving position bear no relation to whether White had reasonable suspicion to stop Hennesy for speeding.

---

[6] Nor does following a vehicle constitute a search, as "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983).

White observed Hennesy speeding on a public road, and this provided the requisite

"quantum of individualized suspicion" to initiate the stop. *Winder*, 557 F.3d at 1135.

### B.    Agent White had reasonable suspicion to prolong the stop beyond its traffic-related purpose.

"[An] officer's actions during [a traffic] stop must be reasonably related in scope

to 'the mission of the stop itself.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir.

2023) (quoting *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017)). "[A]n

officer's authority to seize a driver 'ends when tasks tied to the traffic infraction are—or

reasonably should have been—completed.'" *Id.* (quoting *Rodriguez v. United States*, 575

U.S. 348, 354 (2015)). Thus, "a traffic stop 'can become unlawful if it is prolonged

beyond the time reasonably required to complete th[e] mission' of issuing a warning

ticket." *Rodriguez*, 575 U.S. at 354–55 (alteration in original) (quoting *Illinois v.

Caballes*, 543 U.S. 405, 407 (2005)).

In sum, a traffic stop is unlawfully prolonged "when an officer (1) diverts from the

traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way

that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported

by any independent reasonable suspicion." *Cates*, 73 F.4th at 805 (quoting *United States

v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022)).

But questions regarding travel plans "typically are related to the purpose of a

traffic stop" in helping "explain, or put into context, why the motorist

was . . . speeding . . . ." *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (en

banc), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005); *see also*

*United States v. Cortez*, 965 F.3d 827, 838–39 (10th Cir. 2020) (same). The law even permits other unrelated inquiries provided they "do not prolong the detention." *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007). Moreover, an officer may *still* prolong a stop beyond "the time reasonably required to complete th[e] mission' of issuing a warning ticket" (the "*Rodriguez* moment"), if the officer has independent reasonable suspicion to do so. *Rodriguez*, 575 U.S. at 354–55 (alteration in original) (quoting *Caballes*, 543 U.S. at 407); *Cates*, 73 F.4th at 805.

Thus, the Court must determine (1) when the *Rodriguez* moment occurred, and (2) whether Agent White had an independent source of reasonable suspicion at that time.

### 1. The Court finds the "Rodriguez *moment" occurred when White concluded the tasks tied to the written warning and turned to questions directed at drug interdiction.*

Hennesy appears to argue the "*Rodriguez* moment" occurred when White "directed Mr. Hennesy to accompany him to his vehicle . . . ." Mot. Suppress at 4. Hennesy asks rhetorically, "[w]hat other 'information' was needed to achieve [t]he stated purpose of issuing a warning for the infraction?" Hennesy asserts that because White "already had Mr. Hennessy's driver's license," the "'information' [White] was gathering was [White's] further investigation into Mr. Hennesy by interrogation." *Id.*

The government's brief does not pinpoint a "*Rodriguez* moment," instead focusing on whether and when White acquired reasonable suspicion to prolong the stop. *See generally* Resp. Mot. Suppress at 21–26. The government argues White had reasonable suspicion to prolong the stop upon first contact with Joseph and Hennesy, when he "smelled an odor of marijuana emitting from the vehicle." Resp. Mot. Suppress at 22;

Def.'s Ex. 1 at 2 [Doc. No. 72-1]; Ex. 1 at 01:17–02:00 [Doc. No. 76-1].  At oral argument, counsel for the government argued the "*Rodriguez* moment" for the end of the warning process occurred at timestamp 8:46 on the bodycam footage, when White sets his warning booklet down on the dashboard. Ex. 1 at 8:46.

White initiated the stop for speeding and informed Hennesy that he would receive only a written warning. Ex. 1 at 1:23–1:38. White's mission entailed "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as well as confirming the driver's identity and preparing the warning. *Rodriguez*, 575 U.S. at 352–53, 355. Those tasks were complete—or could reasonably have been completed—by the time White finished filling out the warning paperwork after verifying the VIN.[7] *See* Ex. 1 at 6:05–6:37 (return to cruiser); Ex. 1 at 8:40–8:50 (placing the warning booklet on the dashboard and inquiring about contraband). Up to that point, White's inquiries about travel plans and vehicle ownership fell within the scope of the traffic stop, because such questions help contextualize the speeding violation. *Holt*, 264 F.3d at 1221; *Cortez*, 965 F.3d at 839.

This also means—contrary to Hennesy's argument—the "*Rodriguez* moment" did not occur when White invited Hennesy to sit in his patrol car. At that point, White was

---

[7] The Tenth Circuit has not adopted a bright-line rule regarding whether checking a VIN number during a routine traffic stop for speeding "unlawfully prolongs" the stop. *See, e.g.*, *United States v. Ramos*, 723 F. App'x 632, 638 (10th Cir. 2018) (unpublished) (subjecting the question to fact inquiry). Given that Hennesy was not the owner of the vehicle he was driving, the Court sees little issue with this brief cross-check.

still entitled to complete the traffic mission by running records and preparing the warning.[8] At the suppression hearing, White testified his purpose for having Hennesy accompany him to the patrol car was simply logistical—it was convenient to have Hennesy there in case White had clarifying questions regarding Hennesy's address, the validity of his license, or Hennesy's lawful possession of the vehicle.

Instead, the prolongation point came when White had concluded the tasks tied to the warning and turned to questions about contraband. *See* Ex. 1 at 8:46–9:55. At that juncture, further detention needed to be justified by independent reasonable suspicion. *Rodriguez*, 575 U.S. at 354–55; *Cates*, 73 F.4th at 805.

> ### 2.     *White had reasonable suspicion that Hennesy and Joseph possessed marijuana and were trafficking drugs at the* "**Rodriguez** *moment.*"

The stop was not rendered unlawful at the "*Rodriguez* moment" if White possessed independent reasonable suspicion at that time. *Rodriguez*, 575 U.S. at 354–55; *Cates*, 73 F.4th at 805. The record supports that he possessed independent reasonable suspicion well before that moment.

Under *Terry v. Ohio*, investigatory stops short of formal arrest require reasonable suspicion in the form of "specific and articulable facts" that warrant a temporary investigative detention. 392 U.S. 1, 21 (1968). "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than

---

[8] Hennesy's placement in the front seat of White's unlocked cruiser is more germane to the question of de facto arrest, discussed *infra*, than to the determination of the "*Rodriguez* moment."

14

probable cause to effect an arrest." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quoting *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). And an officer may have reasonable suspicion even when "it is more likely than not that the individual is *not* involved in any illegality," so long as the officer has "a particularized and objective basis for suspecting an individual may be involved in criminal activity." *Id.* at 1379–80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

First, White had reasonable suspicion that Hennesy was engaged in unlawful possession of marijuana. When White first approached the vehicle, he noted an odor of marijuana emanating from the interior. Ex. 3 at 3. In the Tenth Circuit, "the odor of marijuana by itself is sufficient to establish probable cause," beyond mere reasonable suspicion. *United States v. Johnson*, 630 F.3d 970, 974 (10th Cir. 2010). And White's suspicion was corroborated by his observation of a marijuana blunt in the Lexus's ashtray, Ex. 1 at 4:13–6:04, which Hennesy stated belonged to Joseph, Ex. 1 at 8:01–8:20. These facts provided reasonable suspicion to believe that Hennesy or Joseph were in possession of marijuana.

Second, White had reasonable suspicion that Hennesy was trafficking drugs. Before even initiating the stop or observing a traffic violation, the Federal License Plate Reader ("FLPR") system informed White of Hennesy's travel pattern.[9] Ex. 3 at 3. And White recognized Hennesy's pattern—spending more time traveling to and from a

---

[9] Agent White also confirmed this timeline in his testimony at the suppression hearing.

destination than *in* the destination itself—comports with known drug smuggling patterns. *Id.* The travel pattern alone may not have been sufficient, but White obtained reasonable suspicion when Hennesy and Joseph each gave externally and internally inconsistent accounts of when the pair traveled to and from Houston. Ex. 1 at 3:03–3:23, 4:12–5:53. Hennesy's statement that the pair left for Houston on "Friday" contradicted both the FLPR system and Joseph's account. White's observations of (1) Hennesy's suspicious travel pattern, (2) Hennesy and Joseph's dishonesty regarding their travel pattern, and (3) the inconsistency between their individual accounts, all lent the rational inference that the pair may be engaged in drug trafficking.

During oral argument at the suppression hearing, Hennesy insisted this was all a pretext—that White never planned to issue a warning. *See also* Mot. Suppress at 1–2. But the Tenth Circuit has consistently "rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citing *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008)). This means White's cross-examination testimony at the suppression hearing—that (1) he essentially "operat[ed] under a local policy instructing officers not to" arrest for marijuana, and (2) the purpose of the stop was drug interdiction—are immaterial. *Id.* at 1135. Hennesy's arguments to the contrary "simply miss the mark because . . . our standard for evaluating the validity of a traffic stop is objective, rather than subjective." *Id.* Because White "observe[d] a traffic or equipment violation," the "*Terry* stop [was] objectively justified, regardless of . . . [White]'s

'subjective motives.'" *Id.* (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)).[10]

### C.    Mr. Hennesy was not subject to de facto arrest until he told White of the presence of cocaine in the vehicle.[11]

Hennesy files this motion to "determine the admissibility of his in-custody statements" under *Jackson v. Denno*, 378 U.S. 368 (1964), and he does not mention the

---

[10] As an aside, Hennesy does not claim racial bias motivated the stop, nor would such an allegation impact a Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

[11] While Hennesy styles this motion under *Jackson v. Denno*, his brief focuses on custody, *see generally* Mot. Suppress (focusing on custody above voluntariness), as does the government's response, *see* Resp. Mot. Suppress at 26–32 (arguing Hennesy was not in custody). The parties' oral arguments at the suppression hearing also did not meaningfully address voluntariness. Thus, despite the captioning of this motion, a *Jackson v. Denno* involuntary confession question is not properly before the Court.

To the extent the question is presented, the Court finds Hennesy's statements voluntary under the totality of the circumstances. The Court so finds for the following reasons: (1) Hennesy was detained and questioned for only a short time; (2) White and Stevenson maintained a professional, calm, and conversational tone throughout the encounter; (3) Hennesy was never offered a "Hobson's choice" or unqualified promise of leniency in exchange for a confession; (4) Hennesy was never physically restrained or dominated; and (5) the fact that White did not initially inform Hennesy of his freedom to refuse questions does not force a finding of police coercion overbearing Hennesy's will. Further, the Court finds nothing in the record that Mr. Hennesy's age, intelligence, and education would have made him "particularly susceptible to coercion." *United States v. Maytubby*, 130 F.4th 1194, 1198 (10th Cir. 2025).

In sum, the Court finds no indication, based on the Court's review of the record, that "law enforcement overbore [Mr. Hennesy's] free will and critically impaired [his] capacity for self-determination." *See United States v. Pena*, 115 F.4th 1254, 1261 (10th Cir. 2024). Rather, considering the totality of the circumstances, the government has shown by a preponderance of the evidence that the defendant's "confession was the result of an essentially free and unconstrained choice." *Id.* at 1262 (citation omitted).

de facto arrest doctrine by name. Mot. Suppress at 8. Courts ordinarily "rely on the parties to frame the issues for decision," taking "the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). But "[t]he [party presentation] principle does not say that once an issue has been raised and responded to, a court must render its decision in accordance with the position of one of the parties. Courts have always had authority to resolve raised issues as fairness requires." *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022).

The Court does not raise a new issue by analyzing the admissibility of Hennesy's statements under the de facto arrest doctrine. The Court is "not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

The Constitution protects an individual against self-incrimination from in-custody interrogations where the arrested individual has not been informed of his rights to remain silent, refuse questions, and acquire counsel. U.S. Const. amend. V, VI; *Miranda v. Arizona*, 384 U.S. 436 (1966).[12] Whether an individual is "in custody" for purposes of *Miranda* turns on "whether a reasonable person in [Hennesy's] position would have understood [his] freedom of action to have been restricted to a degree consistent with

---

[12] During oral argument on this motion, the parties agreed that Mr. Hennesy was subject to "interrogation." The parties only dispute whether Hennesy was "in custody" for *Miranda* purposes.

formal arrest." *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007). "[T]he only relevant inquiry is how a reasonable man in [] [Hennesy]'s position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). And "[a]lthough some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate." *Revels*, 510 F.3d at 1274. This means that the question of whether reasonable suspicion supported the stop is separate from that of whether Hennesy was under arrest for purposes of his *Miranda* rights.[13]

Courts examine the totality of the circumstances to determine whether an individual is in custody for *Miranda* purposes. Specifically, "(1) whether the circumstances demonstrate[] a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning [i]s accusatory or coercive; and (3) whether the police made [the defendant] aware that [he or she] was free to refrain from answering questions, or to otherwise end the interview." *Revels*, 510 F.3d at 1275 (alterations added).

---

[13] As Professor LaFave puts it, "the circumstances of some *Terry* stops have been deemed sufficiently coercive as to constitute 'custody' for *Miranda* purposes even if they are not full-fledged arrests in a Fourth Amendment sense, although under the totality of the circumstances test, it is often hard to identify the combination of events short of an explicit arrest that qualify as *Miranda* custody." Wayne R. LaFave, *Criminal Procedure* § 6.6(e) (4th ed.).

### 1.    That White did not advise Hennesy of his freedom to decline questions weighs toward custody.

That an officer does not inform a detainee of his freedom to refuse questions is "a significant indication of a custodial detention," yet it is "only one factor to consider." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (first quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)). And lack of advisement does not necessarily "transform" the interaction "into a custodial interrogation." *United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015). Moreover, cases focusing on a lack of advice usually involve voluntary interactions rather than *Terry* stops where the person being questioned is not free to leave. *See, e.g.*, *Guillen*, 995 F.3d at 1109. Cases that do find a lack of advisement significant in a *Terry* stop often feature an overwhelming display of force. *See, e.g.*, *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (explaining that a *Terry* stop became custodial for *Miranda* purposes where the detainee "was forced out of his car and onto the ground at gunpoint" and then "questioned by two police officers while police helicopters hovered above").

Still, no binding case law directs the Court to discount or ignore a lack of advisement based on the absence of a large display of force. And here, White did not advise Hennesy that he was free to refuse questioning until providing a *Miranda* warning. *See generally* Ex. 1. The government argues Stevenson's comment to Hennesy—that it would be illegal for the officers to continually question Hennesy until he confessed—constitutes an advisement of Hennesy's freedom to refuse questioning. Resp. Mot. Suppress. at 30; Ex. 1 at 14:10–14:14. But Stevenson's comment points to the illegality

20

of a *lengthy* interrogation rather than to Hennesy's freedom to refuse questions. As such, White and Stevenson's lack of advisement weighs toward custody.

### 2.    The questioning was not coercive, lengthy, or accusatory.

Questioning can become coercive in several scenarios. Coercion can occur from (1) the presentation of a "Hobson's Choice" between cooperation or immediate jail; (2) unqualified and specific representations that cooperation will result in leniency or reduced jail time; (3) a lengthy period of questioning; or (4) with a display of mounting evidence against the defendant. However, neither of the first two situations occur when officers merely explain the logistics of cooperation or make a "limited assurance" regarding the benefits of cooperation. *United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006). A "vague and non-committal" statement of "[i]f you work with us, we'll go easy on you" does not comprise an impermissible offer of leniency. *United States v. Rodebaugh*, 798 F.3d 1281, 1293 (10th Cir. 2015). A display of "mounting" evidence implies showing enough evidence such that "an arrest [is] likely" and thus "a reasonable person in [the defendant]'s shoes would . . . recognize[] as much." *Guillen*, 995 F.3d at 1110–11.

Here, the length of questioning weighs heavily against custodial interrogation, as Hennesy was detained for only around 15 minutes before making inculpatory statements. *See United States v. Nahkai*, 139 F.4th 859, 866–67 (10th Cir. 2025) (finding a 41-minute interrogation insufficient to weigh toward custody).

White and Stevenson did not offer Hennesy unqualified leniency or a "Hobson's Choice" between cooperation and arrest. The agents suggested they "had enough to

arrest" Hennesy, but they did not "follow it up by saying anything to indicate [Hennesy] had to cooperate, *or else*." *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008). Taken in isolation, White's statement to Hennesy that cooperation is "the only chance of you not going to jail" may seem problematic, until considered in the larger context of the statement. Ex. 1 at 12:07–12:12. By that point in time, Hennesy had already (1) provided dishonest and internally contradictory accounts of his travel patterns, (2) volunteered permission to search the car, Ex. 1 at 8:09–8:37, and (3) possibly indicated the presence of cocaine in the vehicle, Ex. 1 at 10:29–10:30 (Hennesy responding to White's query of "coke?" with the words "you know").

 That means White knew he had consent to search the car and that he might well find cocaine inside. With this knowledge, White pivoted the conversation toward gaining Hennesy's assistance in identifying the "grow or dispensary . . . [Hennesy] picked up from." Ex. 1 at 11:39–11:56. Naturally, this required White to quickly explain the time-sensitive process and how it might benefit Hennesy:

> [The dispensary is] what I'm after. So, let me just explain this real quick.  So how it works is for the level of cooperation, you have to be completely honest about everything. You have to give me access to your phone. You have to tell me exactly how the whole system works. That's the only chance of you not going to jail. Does that make sense? I'm not lying to you. Like, I've let a lot of people go, but I do have to call my boss. I can't make a promise roadside.

Ex. 1 at 11:56–12:19.  This context shows White was simply explaining the logistics of the process and outlining how Hennesy *may* benefit from cooperating. White did indicate he had the ability to arrest Hennesy, and thus "might have reminded [him] of the police's

coercive powers." *Jones*, 523 F.3d at 1241. But White could not have explained the unique, though non-guaranteed, benefit of immediate cooperation *without* suggesting the corollary downside of possible arrest.

Moreover, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). So while White's passing use of the word "only" was inadvisable, it was insufficient to transform the tenor and totality of the interaction into a custodial interrogation.

Nor do Agent Stevenson's comments tip the scales. Stevenson simply encouraged Hennesy's cooperation and directed the focus of the investigation toward Hennesy's supplier or source. Like White, Stevenson spoke conversationally and politely, and he made no unqualified offers of leniency. Ex. 1 at 12:57–13:46.

To the extent White and Stevenson's statements displayed a choice between arrest or cooperation, the context—directing attention toward Hennesy's supplier or source— places the agents' statements short of creating custodial interrogation under the totality of the circumstances.

Finally, prior to his inculpatory statements, Hennesy was never confronted with mounting evidence against him. The most Agent White ever presented to Hennesy was the untruthfulness of his travel plans, and this inconsistency alone would not have made a reasonable person understand that an "arrest was likely." Ex. 1 at 9:31–9:48; *Guillen*, 995 F.3d at 1111.

23

Given (1) the short length of detention; (2) the lack of confrontation with mounting evidence; (3) the calm and conversational approach of the agents; and (4) the outward-focused and non-committal character of the agents' statements on cooperation, the nature of the questioning weighs against custodial interrogation.

### 3. *Mr. Hennesy was not placed in a "Police-Dominated" environment.*

In deciding whether agents placed Hennesy in a police-dominated environment, the Court considers (1) Hennesy's presence in Agent White's police cruiser, (2) Hennesy's separation from Joseph, (3) Hennesy's access to his phone, (4) the public nature of the encounter, (5) the use of physical contact against Hennesy, and (6) the number of officers who questioned Hennesy.

#### i. Hennesy's location in the front seat of the police cruiser

Hennesy's presence in the front seat of Agent White's police cruiser does not evince police domination, as "location alone does not compel the conclusion that a defendant is in custody, so long as his freedom was not curtailed to a degree similar to arrest." *United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) (collecting cases). Mr. Hennesy "was asked, not ordered, to accompany the agent[] to the vehicle. He did so of his own volition. This voluntary decision . . . argues against police domination." *Id.* at 1264. And "the record does not suggest that [Hennesy] was ever handcuffed, and his position in the passenger seat of the vehicle suggests a lack of arrest."[14] *Id.* Hennesy

---

[14] The rear-facing dashcam footage shows Hennesy was not placed in handcuffs until timestamp 1:45:07. Ex. 2 at 1:45:00–1:45:15.

himself states that White "requested" Hennesy accompany him to the front seat of the police cruiser. Mot. Suppress at 2.

   ii.   <u>Hennesy's separation from Joseph</u>

  Hennesy's separation from Joseph bears no weight toward police domination. The Tenth Circuit has found that separation from family or friends can weigh toward custody. *Jones*, 523 F.3d at 1240. But Hennesy's separation from Joseph arises from Hennesy's acquiescence to White's suggestion Hennesy join him in his police cruiser to make the process "faster." Ex. 1 at 1:38–2:02. Because Hennesy's separation from Joseph was voluntary, it cannot weigh toward a custodial finding.

   iii.   <u>Hennesy's access to his phone</u>

  Separation can also relate to the detainee's ability to contact the outside world, *Jones*, 523 F.3d at 1240, meaning Hennesy's access to his phone presents a slightly closer question. On one hand, Hennesy had possession of his phone for most of the initial questioning, Ex. 1 at 16:00–16:10, and Hennesy is seen on the dashcam using his phone multiple times, Ex. 2 at 4:53–5:47, 6:00–6:08. Yet White interrupts Hennesy's cell phone use (albeit in a neutral and conversational tone) before requesting Hennesy "let [him] see" it. *See, e.g.*, Ex 1 at 12:27–12:33; Ex. 1 at 16:00–16:10.

  White justifies requesting possession of the phone by commenting that it is "distracting" from White explaining the details of Hennesy's proposed cooperation. Ex. 1 at 16:00–16:09. And White takes possession of the phone merely by *requesting* Hennesy "let [him] see" it before taking the phone and placing it on the dashboard—without protest from Hennesy. *Id.* This manner of taking the phone indicates action that is

oriented toward focusing the conversation, rather than dominating the atmosphere or placing Hennesy in custody.[15]

### iv.    The public setting of the police encounter

The setting of the encounter—on a public roadside—further weighs against a police-dominated atmosphere. The Supreme Court has stated "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than" typical custodial interrogations. *Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984). This traffic stop, like most of its kind, took place on a public roadway where "[p]assersby, on foot or in other cars witness[ed] the interaction[] . . . ." *Id.* at 438.

### v.    The use of physical contact

Agents likewise did not dominate the encounter using physical contact. The Tenth Circuit treats making "physical contact" as a factor weighing toward domination. *United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993). But the bodycam footage shows no appreciable physical contact with Hennesy at any point until he was placed in handcuffs and patted down more than an hour and a half after the initiation of the stop. Ex. 2 at

---

[15] To the extent White's possession and control over Hennesy's phone use does suggest police domination, the factor is not dispositive and fails to tip the totality of the circumstances toward a finding of custodial interrogation. Were White and Hennesy merely engaged in a voluntary conversation, Hennesy's freedom to use his phone might carry more weight. But here, Hennesy was subject to a valid *Terry* stop—he was not free to leave. Moreover, the Tenth Circuit has declined to find custody by the exercise of officer control over the detainee's use of his phone in the context of a *Terry* stop (albeit in an unpublished decision). *United States v. Gaiter*, No. 23-8037, 2024 WL 2845759, at *4 (10th Cir. June 5, 2024) (unpublished) (declining to find police-dominated atmosphere where officer disallowed detainee's phone use after 20 minutes).

1:45:00–1:45:57. While the footage occasionally shows White's hand on Hennesy's shoulder, this contact is clearly a gesture of comfort as Hennesy deals with his emotions in the moment. *See, e.g.*, Ex. 2 at 18:16.

### vi.     The number of questioning officers

The fact that Hennesy was questioned by only one or two officers throughout the encounter also weighs against police domination. The Tenth Circuit has held that the presence of only one or two interviewing officers ordinarily does not create a police-dominated atmosphere; it is the "*threatening* presence of several officers" that raises concern. *Jones*, 523 F.3d at 1242. Here, Agent White asks nearly every question, with Agent Stevenson present in the backseat for only part of the interaction. *See generally*, Ex. 2 at 3:00–10:19. Moreover, both Agents consistently maintain a polite and conversational tone throughout the stop. *See generally*, Exs. 1–2.

### 4.     *Under the totality of the circumstances, Hennesy was not in custody for purposes of* Miranda.

Considering the totality of the circumstances, the Court concludes Mr. Hennesy was not in custody for *Miranda* purposes until he made the statements "because it's cocaine," "a lot of cocaine," "too much cocaine," and "life sentence cocaine." Ex. 1 at 16:22–16:37. Hennesy then directed officers to the location of the cocaine in a box in the front seat. *Id.* At that point, White correctly noted the discovery of this evidence and

Hennesy's clear inculpatory statements meant "arrest was likely," *Guillen*, 995 F.3d at 1111, and so proceeded to read Hennesy his *Miranda* rights.

In summary: (1) the stop occurred in public view on the interstate; (2) Mr. Hennesy sat unrestrained in the front passenger seat of the unlocked police vehicle voluntarily; (3) the officers did not draw or display their service weapons, nor did they use force; (4) only one or two officers engaged Hennesy; (5) Hennesy retained access to his phone for most of the exchange; (6) the pre-*Miranda* period was brief and conversational; and (7) the agents did not confront Hennesy with mounting evidence of guilt. The discussion of cooperation was paired with accurate disclaimers, amounting to explanations rather than a "Hobson's choice." On these facts, a reasonable person would not have understood his freedom to be restrained to the degree associated with formal arrest.[16]

### D.    Hennesy knowingly and intelligently waived his *Miranda* rights.

Although not explicitly challenged by the parties, the Court deems it necessary to confirm that Hennesy knowingly and intelligently waived *Miranda*, as Hennessy's Motion argues that the *Miranda* warning was insufficient. *See* Mot. Suppress at 4.

---

[16] Because the Court finds that Hennesy was not in custody for *Miranda* purposes until he explicitly confessed to the presence of cocaine in the vehicle, the question of whether White engaged a deliberate two-step strategy to undermine *Miranda* is not before the Court. *Guillen*, 995 F.3d at 1111 (addressing two-step strategies in midstream *Miranda* warnings only in the context of unwarned custodial interrogations); *see also Missouri v. Seibert*, 542 U.S. 600, 604–05 (2004) (same). Still, the Court finds no evidence suggesting Agents White or Stevenson engaged a deliberate two-step strategy in this case.

Courts begin with the presumption that a defendant has not waived his *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The government must show express or implied evidence of waiver through words or actions. *Id.* Courts in the Tenth Circuit examine the "totality of the circumstances," *United States v. Burson*, 531 F.3d 1254, 1256–57 (10th Cir. 2008), and a written or oral waiver is "strong proof" of validity. *United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986). "A waiver is made knowingly and intelligently when made 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Burson*, 531 F.3d at 1257 (quoting *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002)). In sum, the government must prove "the decision [to waive] is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993).

The facts show Hennesy knowingly and intelligently waived his *Miranda* rights. As White prepares to read from his *Miranda* card, the dashcam footage shows Hennesy reacting with emotion and remarking on the fact that his rights are being read to him. Ex. 2 at 17:31–17:40. Hennesy's audible statement, "you're gonna read me my rights," shows he had a present understanding that White was indeed reading him his *Miranda* rights. *Id.* After the warning and follow-up questions from White on whether Hennesy understands his rights, Hennesy pauses for a moment before saying "yes" and continuing to speak with White. Ex. 2 at 17:40–18:09. In the following minutes, Hennesy makes a statement referencing the content of the *Miranda* warning, musing that the warning means his cooperation is futile. Ex. 2 at 22:55–23:05. Hennesy's post-warning remark shows he recalled the content of the *Miranda* warning—and that he understood its meaning.

29

Hennesy's (1) reaction to the warning, (2) moment of thought before affirmation, and (3) comment repeating the content of the warning all confirm his contemporaneous understanding and intelligent waiver of his *Miranda* rights.

**IV.    <u>CONCLUSION</u>**

For these reasons, the Court DENIES James Jermaine Hennesy's Motion to Suppress.

IT IS SO ORDERED this 9th day of September 2025.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE